1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                   SOUTHERN DISTRICT OF CALIFORNIA

10

11 | LAWRENCE MICHAEL DEMKO,                  Case No.:  15cv906-LAB(BLM)
                                Plaintiff,
12 |                                          **REPORT AND RECOMMENDATION FOR
   v.                                         ORDER DENYING PLAINTIFF'S
13 |                                          MOTION FOR SUMMARY JUDGMENT
   COMMISSIONER OF SOCIAL SECURITY,           AND GRANTING DEFENDANT'S
14 |                                Defendant. MOTION FOR SUMMARY JUDGMENT**

15                                            **ECF Nos. 13 & 17**

16          Plaintiff Lawrence Michael Demko brought this action for judicial review of the Social

17 Security Commissioner's ("Commissioner") denial of his claim for disability insurance benefits.

18 ECF Nos. 1 and 13-1 at 4.  Before the Court are Plaintiff's Motion for Summary Judgment [ECF

19 No. 13-1 ("Pl.'s Mot.")], and Defendant's Cross-Motion for Summary Judgment and Opposition

20 to Plaintiff's Motion for Summary Judgment (ECF No. 17-1 "Def.'s Mot." & 18 "Def.'s Opp'n")[1].

21

22

[1] Defendant's Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion for
23 Summary Judgment appear on the docket as two documents, numbers 17 & 18.  However, the

1

Plaintiff did not file a reply to Defendant's opposition or an opposition to Defendant's cross motion for summary judgment.  <u>See</u> Docket.

This Report and Recommendation is submitted to United States District Judge Larry Alan Burns pursuant to 28 U.S.C. § 636(b) and Local Civil Rule 72.1(c) of the United States District Court for the Southern District of California.  For the reasons set forth below, this Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Cross-Motion for Summary Judgment be **GRANTED**.

## **PROCEDURAL BACKGROUND**

On September 6, 2012, Plaintiff filed a  Title II application for disability and disability insurance benefits alleging disability beginning on July 17, 2012.  <u>See</u> Administrative Record ("AR") at 20.  The claims were denied initially on March 22, 2013, and upon reconsideration on June 20, 2013, resulting in Plaintiff's request for an administrative hearing on July 11, 2013.  <u>Id</u>.

On August 22, 2014, a hearing was held before Administrative Law Judge ("ALJ") Jesse J. Pease.  <u>Id.</u> at 20, 32.  Plaintiff and an impartial vocational expert (Troy L. Scott) testified at the hearing.  <u>Id.</u> at 20.  In a written decision dated November 18, 2014, ALJ Pease determined that Plaintiff was not disabled under sections 216(i) and 223(d) of the Social Security Act.  <u>Id.</u> at 32.  Plaintiff requested review by the Appeals Council.  <u>Id.</u> at 1.  In a letter dated February 23, 2015, the Appeals Council found no basis for reviewing the ALJ's ruling, and the ALJ's decision therefore became the final decision of the Commissioner.  <u>Id.</u>

On April 23, 2015, Plaintiff filed the instant action seeking judicial review by the federal

content of the documents is the same.  For clarity, the Court will refer to Defendant's cross-motion and opposition as one document, namely, "Def.'s Mot."

1   district court.   See ECF No. 1.   On September 9, 2015, Plaintiff filed a motion for summary

2   judgment alleging that the ALJ failed "to assign proper weight to Plaintiff's treating source

3   opinions contained in the record."   Pl.'s Mot. at 6.   Defendant filed a timely cross-motion for

4   summary judgment asserting that the "ALJ properly considered the medical evidence of record."

5   Def.'s Mot. at 3.

6                                         **ALJ's DECISION**

7          On November 18, 2014, the ALJ issued a written decision in which he determined that

8   Plaintiff was not disabled as defined in the Social Security Act.   AR at 20-32.   Initially, the ALJ

9   determined that Plaintiff had not engaged in substantial gainful activity during the relevant time

10  period (since July 17, 2012).   Id. at 22.   He then considered all of Plaintiff's medical impairments

11  and determined that the following impairments were "severe" as defined in the Regulations:

12  "cognitive disorder, not otherwise specified; chronic lumbar strain and sprain; history of bilateral

13  knee injuries with minimal degenerative changes; and status-post left forearm fracture with

14  fracture of the radius, status-post surgical repairs (20 CFR 404.1520(c))."   Id.   At step three,

15  the ALJ found that Plaintiff's medically determinable impairments or combination of impairments

16  did not meet or medically equal the listed impairments.   Id. at 23.   In reaching this decision, the

17  ALJ noted that

18              No treating physician has identified findings equivalent in severity to the criteria
19              of any listed impairment, nor does the evidence show medical findings that are
                the same or equivalent to those of any listed impairment
20

21  Id. at 23-24.   At step four, the ALJ considered Plaintiff's severe impairments and determined

22  that his residual functional capacity ("RFC") permitted him "to perform light work as defined in

23  20 CFR 404.1567(b)" which specifically means that Plaintiff "can lift 10 pounds frequently and

3

20 pounds occasionally and the claimant can stand and/or walk for six hours of an eight-hour period and can sit for six hours out of an eight-hour period.  Postural activities are limited to an occasional basis, but no ladders, ropes, scaffolds, hazardous machinery, or unprotected heights. The work must be noncomplex."  Id. at 25.  In reaching this decision, the ALJ found that the "objective findings, treatment records, consultative examinations and State Agency consultants' opinions, support a finding that [Plaintiff] is not disabled."  Id. at 31.

## STANDARD OF REVIEW

Section 405(g) of the Social Security Act permits unsuccessful applicants to seek judicial review of the Commissioner's final decision.  42 U.S.C. § 405(g).  The scope of judicial review is limited in that a denial of benefits will not be disturbed if it is supported by substantial evidence and contains no legal error.  Id.; see also Batson v. Comm'r Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004).

Substantial evidence is "more than a mere scintilla, but may be less than a preponderance."  Lewis v. Apfel, 236 F.3d 503, 509 (9th Cir. 2001) (citation omitted).  It is "relevant evidence that, considering the entire record, a reasonable person might accept as adequate to support a conclusion."  Id. (citation omitted); see also Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1011 (9th Cir. 2003).  "In determining whether the [ALJ's] findings are supported by substantial evidence, [the court] must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the [ALJ's] conclusion."  Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (citations omitted).  Where the evidence can reasonably be construed to support more than one rational interpretation, the court must uphold the ALJ's decision.  See Batson, 359 F.3d at 1193.  This includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts.  See Lewis, 236 F.3d

4

1    at 509.

2          Even if the reviewing court finds that substantial evidence supports the ALJ's conclusions,

3    the court must set aside the decision if the ALJ failed to apply the proper legal standards in

4    weighing the evidence and reaching his or her decision.  See Batson, 359 F.3d at 1193.  Section

5    405(g) permits a court to enter judgment affirming, modifying, or reversing the Commissioner's

6    decision.  42 U.S.C. § 405(g).  The reviewing court may also remand the matter to the Social

7    Security Administration for further proceedings.  Id.

8                                            **DISCUSSION**

9          Plaintiff argues that the ALJ improperly failed to include in the RFC determination physical

10   and mental limitations identified by Plaintiff's treating physicians.  Pl.'s Mot. at 7.  Plaintiff

11   explains that the ALJ failed to "provide clear and convincing reasons for preferring the opinions

12   of one time examiners and non-examiners over treating and specialist opinions."  Id. at 16.

13   Plaintiff also argues that the ALJ was required to give greater weight to the Veterans

14   Administration's ("VA") determination of disability for Plaintiff.  Id. at 21.  Finally, Plaintiff argues

15   that the ALJ erred by not considering Plaintiff's "stellar work history."  Id. at 23.

16         Defendant contends that the ALJ properly considered evidence of Plaintiff's physical and

17   mental impairments.  Def.'s Mot. at 4-5.  Defendant further contends that the ALJ properly

18   considered evidence of Plaintiff's VA disability rating "because the evidence before the agency

19   contradicted the grounds upon which the VA based its disability rating."  Id. at 7.  Finally,

20   Defendant notes that the ALJ was under no obligation to discuss Plaintiff's work history.  Id. at

21   8.

22   ///

23   ///

                                              5

**A.      The ALJ Did Not Improperly Reject the Opinions of Plaintiff's Treating Doctors.**

Plaintiff argues that his treating physicians identified physical and mental limitations, which the ALJ improperly failed to include in the RFC determination.  Pl.'s Mot. at 7-15.  Specifically, Plaintiff asserts that Dr. Cara Eggers, a clinical psychologist at the Veteran's Administration, identified several significant mental deficits, which Plaintiff argues are supported by medical records and neuropsychological testing, and that the ALJ improperly rejected these deficits when he adopted the unsupported findings of Dr. Ted Shore, a consultative examiner and licensed psychologist.  Id. at 7-11, 17-18.  Plaintiff also argues that Dr. Donald Pellioni, a physiatrist,[2] and Dr. Rebecca Kim, identified a number of physical limitations that the ALJ improperly discounted or rejected and failed to include in the RFC.  Id. at 11-15, 18-20.

1.      Relevant Law

The opinion of a treating doctor generally should be given more weight than opinions of doctors who do not treat the claimant.  See Turner v. Comm'r of Soc. Sec., 613 F. 3d 1217, 1222 (9th Cir. 2010) (citing Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995)).  If the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons supported by substantial evidence in the record.  Id. (citing Lester, 81 F.3d at 830-31).  Even when the treating doctor's opinion is contradicted by the opinion of another doctor, the ALJ may properly reject the treating doctor's opinion only by providing "specific and legitimate reasons" supported by substantial evidence in the record for doing so.  Id. (citing Lester, 81 F.3d at 830-31).  This can be done by "setting out a detailed and thorough summary

---

[2] A physiatrist is a medical doctor who has completed training in the specialty of physical medicine and rehabilitation.  See http://www.merriam-webster.com/dictionary/physiatrist/.

of the facts and conflicting clinical evidence, stating [his] interpretation thereof, and making findings." Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989). "The ALJ must do more than offer his conclusions. He must set forth his own interpretations and explain why they, rather than the doctors', are correct." Orn v. Astrue, 495 F.3d 625, 632 (9th Cir. 2007) (quoting Embrey v. Bowen, 849 F.2d 418, 421-22 (9th Cir. 1988)). "The opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician; such an opinion may serve as substantial evidence only when it is consistent with and supported by other independent evidence in the record." Townsend v. Colvin, 2013 WL 4501476, *6 (C.D. Cal. Aug. 22, 2013) (quoting Lester, 81 F.3d at 830–31) (citing Morgan, 169 F.3d at 600).

2.  Mental Health Medical History

Plaintiff was referred for a neuropsychological evaluation in April 2011 by Dr. Lasker due to Plaintiff's reporting of cognitive problems and his history of head injury. Id. at 438. The doctor, clinical psychologist J. Vincent Filoteo, administered a wide variety of tests during the examination, the results of which were consistent with a diagnosis of "Cognitive Disorder NOS, mild characterized by mild executive dysfunction, naming problems, and slowed processing speed." Id. at 440-444. Dr. Filoteo recommended a neurological evaluation with an MRI and referral to the Mental Health Clinic in light of Plaintiff's scoring which indicated a moderate level of depressive symptoms. Id. at 443. Dr. Filoteo further recommended that Plaintiff "only attempt one task at a time and that he allow extra time to complete tasks." Id. Dr. Filoteo opined that Plaintiff could benefit from cognitive rehabilitation and repetition of verbal material. Id.

7

Dr. Cara Z. Eggers, a clinical psychologist, examined Plaintiff on February 28, 2012 as part of a disability evaluation for the VA.  Id. at 360-69.  At the time, Plaintiff had been diagnosed with dementia due to head trauma and insomnia in the Axis I category and was "10% service-connected for Brain Syndrome."  Id. at 362-363.  Dr. Eggers reviewed Plaintiff's "C-file" and interviewed Plaintiff, but apparently did not perform any psychiatric or psychological tests.  See Id. at 366, 360-69. Dr. Eggers opined that Plaintiff suffered from occupational and social impairment "with deficiencies in most areas, such as work, school, family relations, judgment, thinking and/or mood."  Id. at 365.  She noted that Plaintiff's dementia "impairs him severely in all areas.  His insomnia exacerbates the dementia and makes it more difficult, sometimes impossible, for him to perform work and social tasks."  Id.  Dr. Eggers further noted that despite being able to work full time, Plaintiff is unable to perform to the standards of his employer, has little hope of advancing or increasing his earnings, and has difficulty remembering what to do when he is fatigued.  Id.  She concluded that Plaintiff cannot work when his insomnia is active.  Id. at 366.  She also found that Plaintiff suffered from (1) chronic sleep impairment, (2) mild memory loss, (3) impairment of short and long term memory, (4) memory loss for names of close relatives, own occupation, or own name, (5) speech intermittently illogical, obscure, or irrelevant, (6) difficulty in understanding complex commands, (7) impaired abstract thinking, (8) gross impairment in thought processes or communication, (9) difficulty in establishing and maintaining effective work and social relationships, and (10) impaired impulse control.  Id. at 367-368.  Dr. Eggers assigned Plaintiff a GAF score of 50.  Id. at 363.  Dr. Eggers concluded her report by noting that Plaintiff is extremely close to being totally impaired and that the only reason she is not finding that to be the case now is because he is currently working a job, although she opined that he is not meeting his employer's expectations and has received

numerous exceptions due to his Veteran status.  Id. at 369.  The record does not contain evidence that Dr. Eggers provided on-going treatment to Plaintiff or examined him on any other occasion.

Dr. Ted Shore completed a Complete Psychological Evaluation of Plaintiff on January 16, 2013 at the request of the Department of Social Services Disability & Adult Programs Division. Id. at 325.  As part of the evaluation, Dr. Shore administered the following tests: Wechsler Adult Intelligence Scale Fourth Edition, Wechsler Memory Scale Fourth Edition, and the Bender Visual-Motor Gestalt Test – Second Edition.   The Wechsler Adult Intelligence Scale showed that Plaintiff's overall intellectual ability was within the average/high average range, the Wechsler Memory Scale showed that Plaintiff's memory fell within the superior/high average range, and the Bender Visual- Motor Gestalt Test showed a high range or performance in the copy phase and that Plaintiff's recall is in the average range which suggests an intact visual memory.  Id. at 327-329.   Dr. Shore noted that Plaintiff reported that he is able to take care of his personal hygiene, perform chores, shop, complete errands, drive, manage funds, wash dishes, vacuum, clean laundry, shop, sweep, cook, perform yard work, and dress and care for his children.  Id. at 326.  He found that Plaintiff had average or higher intelligence, an organized thought process, and good remote memory.  Id. at 327.  Dr. Shore concluded that Plaintiff has no functional limitations and that he has the intellectual/emotional capacity to function effectively in a work setting and perform routine and complex work.  Id. at 329-330.  Dr. Shore noted that Plaintiff appears to get along well with others and has no difficulty relating to coworkers, supervisors and the public.  Id.

Non-examining doctor J. Flocks reviewed Plaintiff's medical records and completed a Disability Determination Explanation for Plaintiff.  Id. at 87-99.  On March 22, 2013, Dr. Flocks

concluded that Plaintiff was not disabled and that despite some limitations, Plaintiff was not prevented from performing his past relevant work ("PRW").  Id. at 98-99.  Dr. Flocks found that the "report of Dr. Eggers is at odds with every other AMS opinion in the records and the clinical data.  I must reject the diagnosis of dementia as incorrect."  Id. at 93-95, 107-108.  He further stated that the VA used a very unreliable test (the Beck Inventory) for finding Plaintiff to have mild depression and noted that the test results can fluctuate by twenty points in a single day in the same patient.  Id. at 95, 108.  Dr. Flocks concluded that there may be a mild depression present, but that the claim was non-severe.  Id.

On June 18, 2013, K.P. Morris, PsyD reviewed Plaintiff's case and found that the evidence was consistent with non-severe impairment and adopted Dr. Flocks's findings.  Id. at 108.  Doctor Morris agreed that Plaintiff's organic mental disorders and affective disorders lead to a mild restriction of activities in daily living, mild difficulties in maintaining social function, concentration, persistence, or pace, and no repeated episodes of decompensation.  Id. at 109.

3.    Analysis

Initially, the Court finds that Plaintiff's broad statement that the ALJ improperly "reject[ed] every treating opinion in the records (including specialist opinions) in determining his RFC" [see Pl.'s Mot at 16] is unsupported.  The ALJ considered Dr. Filoteo's findings that Plaintiff experienced "mild executive dysfunction, naming problems, and slowed process speed" and gave "some weight to Dr. Filoteo's opinion that [Plaintiff] may benefit from repetition of verbal material."  Id. at 29.  This weight was reflected in the ALJ's RFC analysis limiting Plaintiff to noncomplex tasks.  Id. at 25, 29.  Accordingly, the ALJ incorporated some of Dr. Filoteo's opinions and Plaintiff does not specifically argue that the ALJ improperly rejected Dr. Filoteo's opinions or that the limitation to noncomplex tasks is insufficient to account for Dr. Filoteo's

recommendations.  See Pl.'s Mot.

Secondly, the Court finds that the ALJ properly rejected Dr. Eggers' opinion.  Dr. Eggers' opinion was contradicted by Drs. Shore, Flocks, Morris, and Filoteo.  Id. at 360-369, 325-329. Dr. Eggers concluded that Plaintiff was close to totally impaired and was only able to work in his then current position because he was receiving numerous exceptions due to his Veteran status and that even with those exceptions, he was still failing to meet expectations.  Id. at 369.  Dr. Shore, however, opined that Plaintiff had no functional limitations and had the capacity to function effectively in a work setting performing routine and complex work.  Id. at 329-330. Drs. Flocks and Morris concluded that any mental limitations of Plaintiff were non-severe.  Id. at 109.  Similarly, although made at an earlier time, Dr. Filoteo found that Plaintiff had mild mental impairments.  Id. at 440-44.  Because Plaintiff's treating physician, Dr. Eggers, was contradicted by other doctors, the ALJ was required to provide specific and legitimate reasons supported by substantial evidence in the record for rejecting her opinion.  Turner, 613 F. 3d at 1222 (citing Lester, 81 F.3d at 830-31).  The ALJ has done just that.

The ALJ states that he gave "little weight" to Dr. Eggers' opinions that Plaintiff's dementia was "extremely impairing," limited the type of work he could perform, and that because Plaintiff was still working, she did not find he had "total occupational and social impairment."  AR at 29. In support, the ALJ states that Dr. Eggers' opinions were vague, failed to provide a function-by-function assessment of Plaintiff's abilities, and were inconsistent with the neuropsychological and objective test results performed during the psychological consultative examination.  Id. at 29-30.  The ALJ specifically cites to the April 21, 2011 neuropsychology consult with Dr. Filoteo and the January 16, 2013 complete psychological evaluation performed by Dr. Shore.  Id. at 30, 325-330, and 438-444.

Vagueness and the failure to provide a function-by-function assessment of Plaintiff are not specific and legitimate reasons for rejecting Dr. Eggers' opinions.  Dr. Eggers' medical records are not vague as they (1) address Plaintiff's previous diagnosis of dementia and insomnia and provide commentary on those conditions with respect to Plaintiff, (2) indicate that Dr. Eggers reviewed Plaintiff's C-file for medical evidence of his conditions, (3) provide a patient history, (4) identify Plaintiff's symptoms, (5) discuss Plaintiff's financial competency, and (6) include Dr. Eggers' conclusions.  Id. 360-369.  In addition, "[t]here is no requirement in the regulations or Social Security Rulings that a medical source opinion must provide a "function by function" analysis, nor does the lack of such an analysis provide a proper basis for an opinion's outright rejection." Farris v. Comm'r of Soc. Sec. Admin., 2012 WL 1552634, at *13 (S.D. Ohio April 30, 2012) (citing Rivers v. Astrue, 2009 WL 1160259, at *15–16 (N.D. Ill. Apr. 29, 2009) (holding that medical sources are not required to provide detailed function by function RFCs but otherwise upholding the ALJs decision because "the ALJ thoroughly considered both medical and non-medical evidence."); Phillips v. Colvin, 2014 WL 1246342, at *4 (C.D. Cal. Mar. 24, 2014) (stating that "the ALJ rejected Dr. Meshi's opinion for the sole reasons that the opinion failed to 'offer specific function-by-function limitations as to the type of stress that [Plaintiff] must avoid.' (AR at 31.) This, however, is not a sufficient reason for rejecting the consultative examiner's opinion") (citing Farris, 2012 WL 1552634, at *13 and Garrison v. Astrue, 2011 WL 813832, at *3 (W.D. Wash. Jan.25, 2011)).  Accordingly, the Court does not find that the alleged vagueness of Dr. Eggers' opinion or the lack of a function-by-function analysis are appropriate reasons for the ALJ's rejection of Dr. Eggers' opinions.

The ALJ also rejected Dr. Eggers' opinions because they were inconsistent with the neuropsychological and objective test results performed during the psychological consultative

examination.  Id. at 30.  This is a specific and legitimate reason for rejecting Dr. Eggers' opinions. The test results that the ALJ refers to in support of his finding appear in the medical records of Dr. Shore who had the opportunity to evaluate Plaintiff and conduct objective testing in January 2013, almost a year after Dr. Eggers' evaluation of Plaintiff.  Id. at 30.  As explained above, Dr. Shore administered a series of objective tests to Plaintiff, the results of which lead Dr. Shore to conclude that Plaintiff has no functional limitations and that he has the intellectual/emotional capacity to function effectively in a work setting and perform routine and complex work.  Id. at 325-331.   The tests included a standardized intelligence test for adults (Wechsler Adult Intelligence Scale), a memory test (Wechsler Memory Scale), and a screen for organic impairment (Bender Visual-Motor Gestalkt Test).  Id.  While it does not appear that Dr. Eggers performed any objective tests, the tests performed by Dr. Shore were clearly independent of any such tests that may have been performed by Dr. Eggers.  See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (stating that "[w]here the opinion of the claimant's treating physician is contradicted, and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then solely the province of the ALJ to resolve the conflict") (citing Magallanes, 881 F.2d at 751).

Dr. Shore also conducted a psychological examination of Plaintiff which showed that Plaintiff's current level of functioning included the ability to care for himself, drive, manage funds, care for his home, and care for his children.  Id. at 326.  Plaintiff was also able to immediately recall 3/3 objects and 2/3 objects after a few minutes, recall eight digits forward and six digits backwards, had normal speech, intact abstract thinking, and an appropriate mood. Id. at 327.  The ALJ relies in part on the finding of Dr. Shore in reaching his conclusions because

1   Dr. Shore had the opportunity to evaluate Plaintiff and conduct objective testing.  Id. at 30.  The

2   ALJ also gave some weight to the medical assessments conducted by State Agency medical

3   consultants Flocks and Morris who, like Dr. Shore, found that based on the psychiatric testing,

4   Plaintiff has no mental limitations.  Id. at 30.  The ALJ noted that the consultants "had the

5   benefit of reviewing the record" and were "familiar with the requirements for determining

6   disability pursuant to the rules and regulations of the Social Security Act, and their findings are

7   consistent with the lack of specialized treatment."  Id.

8         The ALJ did not give any weight to the Global Assessment of Functioning ("GAF") score

9   of 50 that Dr. Eggers assigned to Plaintiff [see id. at 363, 487 (same)].  Id. at 3.  In support of

10  his position, the ALJ stated that the assessment "appears to be based primarily on the [Plaintiff's]

11  subjective complaints, which has been determined to be not fully credible[3] and is not supported

12  by the totality of the medical evidence, lack of mental health treatment, or the objective

13  psychiatric testing."  Id. at 30.  The ALJ has provided a specific and legitimate reasons for

14  rejecting Dr. Eggers' opinion regarding Plaintiff's GAF score.

15        The GAF Scale provides a measure for an individual's overall level of psychological, social,

16  and occupational functioning.  Vanbibber v. Carolyn, 2014 WL 29665, at *1 (W.D. Wash. Jan.

17  3, 2014) (citing Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32–

18  34 (4th ed. 2000).  A GAF score of "41–50 indicates 'serious symptoms (e.g., suicidal ideation,

19  severe obsessional rituals, frequent shoplifting) OR any serious impairment in social,

20  occupational, or school functioning (e.g., no friends, unable to keep a job).'"  Michaels v. Colvin,

21  2014 WL 37744, at *1 (C.D. Cal. Jan. 6, 2014) (quoting American Psychiatric Association,

22

23

[3] Plaintiff does not challenge the ALJ's credibility determination.  See Plf.'s Mot.

Diagnostic and Statistical Manual of Mental Disorders, 32 (4th ed.)); see also AR at 30.  The totality of the medical evidence and objective psychiatric testing supports the ALJ's position and does not support a GAF score of fifty.  First, at the time of Dr. Eggers' opinion, Plaintiff was working a job full-time.  Id. at 365, 369.  While, Dr. Eggers reported (based on Plaintiff's representations) that Plaintiff was "just hanging on" to his job and was failing to meet his employer's standards, the fact that he was holding a full-time job at the time detracts from the idea that Plaintiff was seriously impaired occupationally and unable to keep a job.  Id. at 369.  Second, the record does not indicate that Plaintiff has ever been suicidal, suffered from severe obsessional rituals or frequently shoplifted.  See Id. at 367 (report of Dr. Eggers leaving boxes for depressed mood, anxiety, and near-continuous panic or depression affecting the ability to function unchecked when identifying Plaintiff's symptoms); see also 326 (report of Dr. Shore noting that Plaintiff denied a history of mental illness and a history of receiving mental health services); 108 (report of Dr. Flocks noting that there may be a mild depression present, but that it was non-severe).  Third, Dr. Eggers did not provide any support or justification for her designation of fifty.  Id. at 363 (comment section left blank).  Finally, as noted above, Dr. Eggers apparently did not perform any tests or evaluations, other than interviewing Plaintiff, to reach her diagnosis.  Id. at 360-69.

The Court finds that the ALJ has provided specific and legitimate reasons, supported by substantial evidence in the record, for rejecting the opinions of Dr. Eggers, Plaintiff's treating physician. The ALJ found that Dr. Eggers' opinions were inconsistent with the neuropsychological and objective test results performed during the psychological consultative examination and that GAF score assessment was based primarily on subjective complaints and was not supported by the totality of the medical evidence or the objective psychiatric testing.  Accordingly, the Court

1    **RECOMMENDS** that Plaintiff's Motion for Summary Judgment on this issue be **DENIED**.

2        4.    Physical Health Medical History

3        Dr. Donald J. Pellioni examined Plaintiff on March 23, 2012 as part of a disability

4    evaluation for the U.S. Department of Veteran Affairs ("VA").  Id. at 338-359.  Dr. Pellioni noted

5    that Plaintiff was diagnosed with a left wrist condition in 1984 due to a fracture that Plaintiff

6    sustained when he survived a plane crash.  Id. at 340.  Plaintiff reported to Dr. Pellioni that he

7    has continued to experience weakness and limitations such as less strength and less stability

8    with the left wrist since the crash.   Id.  Dr. Pellioni measured Plaintiff's range of motion in both

9    wrists and found that Plaintiff did have a functional loss and/or impairment of the left wrist

10   resulting in (1) less movement than normal, (2) weakened movement, (3) pain on movement,

11   and (4) localized tenderness or pain or palpation of joints/soft tissue.  Id. at 340-344.  Muscle

12   strength testing revealed that Plaintiff did have normal strength (5/5) with his wrist flexion and

13   wrist extension.   Id. at 344.  Other test performed showed that there is no degenerative or

14   traumatic arthritis.  Id. at 347.  Dr. Pellioni concluded that Plaintiff's wrist condition impacts his

15   ability to work as he will need to "use the right arm as an assist whenever he is using his left

16   arm" which will reduce his work speed.  Id.

17       Dr. Pellioni also examined Plaintiff's left knee which was also injured in the plane crash.

18   Id. at 348.  Plaintiff reported that his knee is painful, unreliable and occasionally gives out when

19   he climbs ladders, stairs, or inclines.  Id.  Dr. Pellioni conducted a range of motion test and

20   found that Plaintiff's left knee flexion was normal at 140 degrees, but that objective evidence of

21   painful motion began at 130 degrees.  Id. at 350.  There was no objective evidence of pain for

22   the left knee extension tests.  Id. at 350-351.  Dr. Pellioni found that Plaintiff did have a

23   functional loss and/or impairment of the left knee resulting in (1) pain on movement, (2)

occasional giving away of the knee, and (3) tenderness or pain or palpation of joints/soft tissue. Id. at 352-353.  Muscle strength testing revealed that Plaintiff did have normal strength (5/5) with his knee flexion and knee extension.  Id. at 354.  Plaintiff also had normal anterior instability, posterior instability, and medial-lateral instability.  Id.  Dr. Pellioni noted that Plaintiff regularly wears a knee brace and concluded that he has "left knee degenerative joint disease associated with residuals, injury, left knee instability" and arthritis in the left knee.  Id. at 358-359.  Dr. Pellioni concluded that Plaintiff's knee condition impacts his ability to work as his knee will give out occasionally going up and down ladders, stairs, or inclines and Plaintiff will move more slowly than his co-workers.  Id. at 359.

Dr. Thomas J. Sabourin performed an Orthopedic Consultation on Plaintiff on January 3, 2013, at the request of the Department of Social Services Disability & Adult Programs Division. Id. at 315.  Dr. Sabourin noted that during the exam, Plaintiff did not use any assistive devices, was able to sit comfortably, rose from his chair without difficulty, and got on and off the examination table without difficulty.  Id. at 316.  Dr. Sabourin conducted a physical examination, orthopedic examination, and neurological examination and found the results were mostly normal, with some mild limitations.  Id. at 316-18.  Dr. Sabourin's final impressions were "chronic lumbar strain and sprain," "history of bilateral knee injuries with minimal degenerative changes commensurate with his age," and "status post left forearm fracture with fracture of radius status post open reduction and internal fixation and removal of metallic devices."  Id. at 318. Dr. Sabourin found no ACL instability, questioned whether Plaintiff actually ever had an ACL problem, found Plaintiff's forearm and back were satisfactory, and concluded that Plaintiff can lift and carry fifty pounds occasionally, twenty five pounds frequently, stand, walk, and sit for six hours in an eight hour work day, and climb, stoop, kneel, and crouch frequently with no

manipulative limitations and no need for canes or other devices.  Id. at 319.  Plaintiff's push and pull limitations match his lift and carry limitations.  Id.

Non-examining Doctors J. Flocks and J. Hartman reviewed Plaintiff's medical records and completed Disability Determination Explanations for Plaintiff.  Id. at 87-99 and 101-114.  On March 22, 2013, Dr. Flocks concluded that Plaintiff was not disabled and that despite some limitations, Plaintiff was not prevented from performing his PRW.  Id. at 98-99.  Dr. Flocks found that Plaintiff had no manipulative, visual, communicative, or environmental limitations and that Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty five pounds, stand, walk, or sit for six hours in an eight hour work day, and was unlimited in his push/pull ability.  Id. at 96-97.  Plaintiff's postural limitations left him able to frequently climb ramps, stairs, ladders, ropes, and scaffolds, stoop, kneel, crouch, and crawl.  Id.  On June 20, 2013, Dr. Hartman also concluded that Plaintiff was not disabled and could perform PRW as a maintenance engineer.  Id. at 112-113.  Dr. Hartman found that Plaintiff had the same RFC as Dr. Flocks.[4]

On September 15, 2014, treating physician Rebecca G. Kim completed a medical opinion form regarding Plaintiff's ability to do work-related activities (physical).  Id. at 651-652.  Dr. Kim found that Plaintiff (1) could lift and carry twenty pounds occasionally and less than ten pounds frequently, (2) could stand, walk, and sit for less than two hours during an eight-hour workday, (3) could sit for ten minutes before changing position, (4) could stand for five minutes before

---

[4] That is that Plaintiff had no manipulative, visual, communicative, or environmental limitations and that Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty five pounds, stand, walk, or sit for six hours in an eight hour work day, was unlimited in his push/pull ability, and could frequently climb ramps, stairs, ladders, ropes, and scaffolds, stoop, kneel, crouch, and crawl.  Id. at 110-112.

changing positions, (5) needed to walk around every thirty minutes for five minutes, (6) needed the opportunity to shift at will, and (7) would not need to lie down during an eight hour shift. Id. at 651.  Dr. Kim reported that these limitations are based upon Plaintiff's decreased range of motion in his lower back (limited by pain), his left wrist weakness, and the decreased dexterity in his left hand.  Id.  Dr. Kim checked boxes indicating that Plaintiff could occasionally twist, stoop (bend), and crouch but could never climb stairs (unless it was only a few stairs and with a railing) or ladders.  Id. at 652.  Dr. Kim stated that this was due to Plaintiff's frequent lower back muscle spasms and decreased range of motion in his back and the decreased range of motion and strength of left upper extremity overhead.  Id.  Dr. Kim also concluded that Plaintiff's ability to reach (including overhead) and finger (fine manipulation) were affected by his impairments.  Id.  She elaborated by noting that Plaintiff is unable to reach over his head with the left upper extremity and has poor dexterity as evidence by the weakness and decreased range of motion shown on Plaintiff's physical exam.  Id.  Plaintiff's left knee injury and chronic knee pain also resulted in limits on kneeling and crawling.  Id.  Dr. Kim stated that Plaintiff's impairments would often interfere with the attention and concentration required to perform simple work-related tasks and cause Plaintiff to be absent from work more than four days a month.  Id.

    4.    Analysis

The ALJ gave "little weight" to Dr. Pellioni's assessment because it was vague and did not provide a function-by-function assessment of Plaintiff's capabilities.  Id. at 28.  The ALJ also gave "little weight" to Dr. Kim's opinions because they were not supported by objective medical evidence and Dr. Kim's treating relationship with Plaintiff was "quite brief."  Id.  The ALJ gave "some weight" to the opinions of Dr. Sabourin and the medical consultants who found that

1    Plaintiff could "perform work at the medium exertional range" because Dr. Sabourin examined

2    Plaintiff, the consultants are familiar with the SSA rules and regulations, and the "findings are

3    consistent with the lack of specialized treatment." Id. at 29.  The ALJ concluded, however, that

4    "after reviewing evidence not available to the aforementioned physicians[5] as well as generously

5    accommodating the [Plaintiff's] subjective complaints of pain, the undersigned adopted a light

6    residual functional capacity with additional limitations that were best supported by the objective

7    evidence." Id.

8           As discussed above with regards to Dr. Eggers' opinions, the Court finds that the ALJ's

9    decision to reject Dr. Pellioni's opinions due to vagueness and the failure to provide a function-

10   by-function assessment of Plaintiff's functional abilities are not specific and legitimate reasons.

11   See Farris, 2012 WL 1552634 at *13; Phillips, 2014 WL 1246342 at *4.  While Dr. Pellioni failed

12   to provide a function-by-function assessment of Plaintiff's limitations, his medical records and

13   opinions which (1) address Plaintiff's previous diagnosis of a left wrist condition due to fracture

14   and left knee condition, (2) include Plaintiff's self-reported symptoms and use of medication to

15   control pain, (3) provide range of motion measurements for Plaintiff's wrists and knees, (4)

16   identify the functional loss, functional impairment, and additional limitations that exist due to

17   the range of motion in Plaintiff's wrists and knees, (5) provide results from Plaintiff's muscle

18   strength testing for his wrists and knees, (6) identify Plaintiff's previous wrist surgery and the

19   residual signs or symptoms due to the surgery, (7) show that no trauma or degenerative arthritis

20   has been documented, (8) describe how Plaintiff's wrist and knee conditions will impact his

21

22   [5] The ALJ does not elaborate or explain what medical records were available to him that were

23   not available to the doctors who examined or reviewed Plaintiff's case and neither side mentions
     the ALJ's comment in their briefing.

15cv906-LAB(BLM)

ability to work, and (9) note Plaintiff's regular use of a knee brace are not vague.  Id. at 339-359.  Accordingly, the Court does not find that the alleged vagueness of Dr. Pellioni's opinion or the lack of a function-by-function analysis are appropriate reasons for the ALJ assigning little weight to Dr. Pellioni's opinions.

In rejecting Dr. Pellioni's opinion, the ALJ also notes that the Disability Benefits Questionnaire that was provided by Dr. Pellioni was completed in March 2012 while Plaintiff was still working.  AR at 28.  Plaintiff argues that this fails to take into consideration that fact that Dr. Eggers reported that Plaintiff was failing to meet the standards of his employer and was "just hanging on" to his job.  Pl.'s Mot. at 19; see also AR at 369.  Given that the Court has found that the ALJ properly rejected Dr. Eggers' opinions, and that Dr. Eggers' comment was only based on Plaintiff's self-reporting, the Court cannot conclude that Plaintiff was "just hanging on" to his job or that the ALJ erred by not relying on the veracity of that statement.  The fact that Plaintiff was working when Dr. Pellioni completed the medical examination and issued his opinions is a specific and legitimate reason in support of the ALJ's decision to assign "little weight" to Dr. Pellioni's medical assessment.[6]

---

[6] Despite assigning only "little weight" to Dr. Pellioni's medical findings, the ALJ considered Dr. Pellioni's findings in creating his RFC and many of the limitations indicated by Dr. Pellioni are addressed by the ALJ's RFC assessment. Dr. Pellioni found that Plaintiff's knee condition impacted his ability to work as his knee will give out occasionally going up and down ladders, stairs, or inclines and Plaintiff will move more slowly than his co-workers. Id. at 359. By limiting Plaintiff's postural activities to an occasional basis (occurring from very little up to one-third of the time) and stating that Plaintiff should not be on ladders, ropes, scaffolds, hazardous machinery, or unprotected heights, the ALJ incorporated this limitation into Plaintiff's RFC. Dr. Pellioni did not provide a function-by-function analysis of Plaintiff's capabilities and did not discuss any limitations on Plaintiff's ability to stand, walk or sit in a workday. While Dr. Pellioni noted that Plaintiff regularly wears a knee brace, he also noted that Plaintiff had normal strength with his knee flexion and knee extension and normal anterior instability, posterior instability, and medial-lateral instability (right and left knee). Id. at 354.

21

The ALJ's decision to give "little weight" to Dr. Kim's opinions because they were not supported by objective medical evidence and because Dr. Kim's treating relationship with Plaintiff was "quite brief" are substantial and legitimate reasons for rejecting Dr. Kim's opinions. AR at 28.  The ALJ found that the objective medical evidence did not support the "severe limitations assessed by Dr. Kim."  Id.  In support, the ALJ identified the progress note from Plaintiff's September 2014 visit with Dr. Kim where despite Plaintiff describing his pain level as an eight out of ten and suffering from episodes of loss of breath, Dr. Kim noted that Plaintiff (1) was "well-appearing, in no acute distress, alert, cooperative and pleasant," (2) had a supple neck with full range of motion, and (3) had a muscle strength rating of five out of five in all extremities with sensation grossly intact.  Id. at 688.  The ALJ also cites to Dr. Pellioni's March 2012 examination where muscle strength testing showed that Plaintiff had normal strength (five out of five) in both his right and left knees for knee flexion and for knee extension.  Id. at 28, 352-354.  Finally, the ALJ cites to Dr. Sabourin's January 2013 orthopedic consultation with Plaintiff where Dr. Sabourin found that Plaintiff had chronic lumbar strain and sprain, but noted that Plaintiff (1) did not use assistive devices, (2) had a normal range of motion of the cervical spine, shoulders, elbows, hips, ankles, right wrist, and feet, (3) had no gross instability in his knees, (4) showed normal sensation to light touch and pinprick and normal motor strength throughout his upper and lower extremities, and (5) had no ACL instability.  Id. at 28, 315-319.[7]

---

[7] Despite assigning only "little weight" to Dr. Kim's medical findings, both Dr. Kim and the ALJ found that Plaintiff could occasionally lift twenty pounds and were very close with respect to how much Plaintiff could lift frequently, ten pounds (ALJ) and nine pounds (Dr. Kim).  AR at 25 and 651. Dr. Kim and the ALJ also agree that Plaintiff cannot climb ladders and that Plaintiff would not need to lie down during an eight hour shift.  Id. at 25 and 652.  Finally, Dr. Kim and the ALJ agree that Plaintiff is limited in his ability to stoop, crouch, kneel and crawl.  Id.  Dr. Kim

The ALJ's decision to give little weight to Dr. Kim's opinion because of the brief nature of her treating relationship with Plaintiff is another substantial and legitimate reason for rejecting her opinions.  See Carrigan v. Colvin, 2014 WL 1757208 at *8 (E.D. Cal. Apr. 30, 2014) (stating that "[t]he length of a treating relationship is a specific and legitimate reason to reject a treating physician and give the physician's opinion less weight" and finding that the ALJ did not err where the ALJ afforded little weight to Dr. Benjamin's opinions because Plaintiff had only one examination with Dr. Benjamin prior to the doctor authoring the letter declaring Plaintiff disabled for a year and the overall length of the treatment relationship prior to writing the letter was approximately one month); see also Alsyouf v. Astrue, 2013 WL 327794, at *16 (C.D. Cal. Jan. 29, 2013) (finding that the ALJ provided specific and legitimate reasons for rejecting a treating doctor's opinion where the doctor only saw Plaintiff on one occasion and the doctor's opinion was outweighed by the totality of the evidence).  Here, the records provided to the Court relating to Dr. Kim's treatment are minimal, indicate a single examination date (9.11.14), and do not identify the tests, if any, she performed to reach her opinions.  AR at 686-691.

The ALJ gave "some weight" to the opinions of Dr. Sabourin and the medical consultants who found that Plaintiff could "perform work at the medium exertional range" because Dr. Sabourin examined Plaintiff, the consultants are familiar with the SSA rules and regulations, and the "findings are consistent with the lack of specialized treatment."  Id. at 29.[8]

---

noted that Plaintiff can only occasionally twist, stoop, and crouch and the ALJ limited Plaintiff's postural activities to occasional.  Id.

[8]  Despite assigning only "some weight" to the medical findings of Drs. Sabourin, Flocks, and Hartman, the ALJ's RFC assessment considered their findings and is actually more restrictive than what they suggested.  While Drs. Sabourin, Flocks, and Hartman concluded that Plaintiff could lift and carry fifty pounds occasionally and twenty-five pounds frequently [see AR at 25,

The Court finds that the ALJ has provided specific and legitimate reasons, supported by substantial evidence in the record, for rejecting the opinions of Plaintiff's treating physicians, Drs. Pellioni and Kim.  The ALJ found that Dr. Pellioni's opinions were less impactful as they were written while Plaintiff was employed.  The ALJ also found that Dr. Kim's opinions were inconsistent with the objective medical evidence[9] and that her treating relationship with Plaintiff was quite brief.  The ALJ provided an example of the contradictory evidence and cites to other examples.  Accordingly, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment on this issue be **DENIED**.

## C.   The ALJ Gave Proper Weight to Plaintiff's Disability Rating as Determined by the VA

Effective January 21, 2011, the VA found that Plaintiff was 100% disabled and increased his military service benefits.  AR at 220-224.  In making this determination, the VA specifically found that his "dementia due to head trauma with primary insomnia" had worsened and

---

96, 111, and 319], the ALJ concluded that Plaintiff could only carry ten pounds frequently and twenty pounds occasionally.  Id. at 25.  In addition, while Drs. Sabourin and Flocks found that Plaintiff could climb, stoop, kneel, and crouch frequently, the ALJ found that Plaintiff's postural activities were limited to an occasional basis.  Id. at 25, 96-97, 110-112, and 319.  The stand, walk and sit limitations found by the ALJ, six hours out of an eight hour workday, are equivalent to the limitations found by Drs. Sabourin, Flocks, and Hartman.  Id.  Accordingly, The ALJ's RFC does consider and account for the limitations found by Drs. Sabourin, Flocks, and Hartman even though the ALJ did not assign great weight to their opinions.

[9] The Court recognizes that Dr. Kim's findings are more recent than those of Drs. Pellioni and Sabourin by a couple of years.  AR at 315, 339, and 651.  However, Dr. Kim's report is very brief and it is unclear if her written comments came from Plaintiff's self-reporting or from independent testing that she performed.  Id. at 651-652.  In addition, where the evidence can reasonably be construed to support more than one rational interpretation, the court must uphold the ALJ's decision which includes deferring to the ALJ's credibility determinations and resolutions of evidentiary conflicts.  See Batson, 359 F.3d at 1193; see also Lewis, 236 F.3d at 509.

increased his disability rating to 100%.  Id. at 222.  The VA found that the damage to Plaintiff's left hand and left knee had not increased in severity and remained at 10% each, the "degenerative arthritis impairment" in his right knee had increased to 10%, and that his shoulder and back complaints were not service-related.[10]  Id. at 221-23.  The VA denied Plaintiff's claim for "individual unemployability . . .  because the evidence does not show you are unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities."  Id. at 223.

Plaintiff argues that the ALJ failed to give proper weight to the VA's determination that Plaintiff was 100% cognitively disabled, as well as physically disabled.  Pl.'s Mot. at 21-23.  While Plaintiff acknowledges that the ALJ is not required to follow the VA's determination, Plaintiff complains that the ALJ failed to give it "great weight" or to provide "persuasive, specific, valid reasons" for rejecting it.  Id. at 22.

### 1.   Relevant Law

"[A]lthough a VA rating of disability does not necessarily compel the SSA to reach an identical result, 20 C.F.R. § 404.1504, the ALJ must consider the VA's finding in reaching his decision."  McCartey v. Massanari, 298 F.3d 1072, 1076 (9th Cir. 2002).  When considering a VA determination of disability, the ALJ must give great weight to the decision because "of the marked similarity between these two federal disability programs."  Id.  Specifically,

> [b]oth programs evaluate a claimant's ability to perform full-time work in the national economy on a sustained and continuing basis; both focus on analyzing a claimant's functional limitations; and both require claimants to present extensive medical documentation in support of their claims.  Both programs have a detailed

---

[10] The notice states that the VA does not add individual percentages of each condition to determine the combined rating.  However, given the severity of Plaintiff's cognitive limitation, the VA determined that Plaintiff's combined disability rating was 100%.  AR at 223.

1    regulatory scheme that promotes consistency in adjudication of claims.  Both are
2    administered by the federal government, and they share a common incentive to
     weed out meritless claims.

3    Id.  An ALJ may give less weight to a VA disability determination only if he or she provides

4    "persuasive, specific, valid reasons for doing so that are supported by the record." Id.

5         2.    Analysis

6         Here, the VA increased Plaintiff's cognitive disability due to dementia to 100%.  AR at

7    222.  In choosing to "not giv[e] great weight" to the VA's decision, the ALJ considered that the

8    rating was based mostly on Plaintiff's self-reported cognitive loss and found that Plaintiff's tested

9    cognitive ability does not justify a finding of disability.  Id. at 29.  In support, the ALJ cites to

10   Dr. Shore's Complete Psychological Evaluation of Plaintiff performed on January 16, 2013.  Id.

11   at 29, 325-330.

12        As discussed in more detail above, and in the ALJ's opinion, the ALJ rejected Dr. Eggers'

13   finding of total cognitive disability because it was inconsistent with the medical records and all

14   of the opinions of other physicians.  The VA complete cognitive disability determination was

15   made by Dr. Eggers and based on her limited examination of Plaintiff.  Because the VA

16   determination was based on Dr. Eggers' examination and the ALJ provided legitimate reasons

17   for rejecting Dr. Eggers' opinion, the ALJ's analysis also provides the requisite "persuasive,

18   specific, valid reasons" for rejecting the VA total disability determination.  Moreover, the Court

19   notes that Dr. Eggers, like Dr. Shore, only examined Plaintiff on one occasion.

20        The VA also found that Plaintiff had a 10% disability rating for each of his left wrist, left

21   knee instability, left knee degenerative joint disease, and right knee degenerative arthritis.  Id.

22   at 221-222.  The ALJ gave "little weight" to this opinion because "examinations revealed that

23   the [Plaintiff] had no tenderness to palpation and normal range of motion of the left wrist as

26

Case 3:15-cv-00906-LAB-BLM  Document 19  Filed 02/11/16  PageID.833  Page 27 of 29

1    well as mild tenderness of the lumbar spine and no strength or coordination deficits of the

2    knees." Id. at 29.  In support, the ALJ cites to the same September 2014 visit with Dr. Kim,

3    March 2012 visit with Dr. Pellioni, and January 2013 visit with Dr. Sabourin that he cited to when

4    he assigned "little weight" to Dr. Kim's medical opinions.  Id. at 28-29; see also supra at 22-23.

5    As stated previously, the ALJ acknowledged that Plaintiff had knee problems and accounted for

6    this in his RFC analysis by limiting Plaintiff to light work with no ladders, ropes, or scaffoldings,

7    and only occasional postural activities.  Id. at 27.  The ALJ also recognized Plaintiff's history of

8    a fractured left forearm and radius and post-surgical repair status and accounted for this with a

9    light RFC capacity.  Id.  In light of the objective medical evidence considered and discussed by

10   the ALJ, the Court finds that the ALJ has provided "persuasive, specific, valid reasons for"

11   assigning little weight to the VA opinions.  Accordingly, the Court **RECOMMENDS** that Plaintiff's

12   Motion for Summary Judgment on this issue be **DENIED**.

13   **D.    The ALJ Did Not Err by Failing to Consider Plaintiff's Work History**

14          Plaintiff's final argument is that the ALJ erroneously failed to properly consider Plaintiff's

15   "stellar" work history when making credibility findings.  Pl.'s Mot. at 23-24.  While Plaintiff

16   explains that he worked for the vast majority of time prior to the onset of his disability and

17   asserts that this factor should weigh in favor of his credibility, Plaintiff does not identify what

18   finding was improper or address any other credibility issues.  Id.  Respondent asserts that the

19   ALJ is not required to consider Plaintiff's work history and because Plaintiff does not challenge

20   the ALJ's adverse credibility finding, the decision not to address this issue is moot.  Def.'s Mot.

21   at 8.

22          While an ALJ may consider a plaintiff's work history when making a credibility

23   determinations, an ALJ is not required to do so.  Dixon v. Colvin, 2015 WL 347569, at *10 (W.D.

27

Wash. Jan. 26, 2015) (stating "thus, a claimant's work history is also one of the factors that may be considered by the ALJ in evaluating credibility") (citing <u>Smolen v. Chater</u>, 80 F.3d 1273, 1284 (9th Cir.1996) and <u>Thomas v. Barnhart</u>, 278 F.3d 947 at 959 (9th Cir.) (upholding the ALJ's adverse credibility findings because the claimant had "an extremely poor work history" and "has shown little propensity to work in her lifetime.")).   Here, Plaintiff is not questioning the ALJ's credibility determination and the ALJ does not have a duty or obligation to analyze Plaintiff's work history.   Accordingly, the Court **RECCOMMENDS** that Plaintiff's motion for summary judgment on this issue be **DENIED**.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

1

**CONCLUSION**

2   For the reasons set forth above, this Court **RECOMMENDS** that Plaintiff's Motion for

3 Summary Judgment be **DENIED** and Defendant's Cross-Motion for Summary Judgment be

4 **GRANTED**.

5   **IT IS HEREBY ORDERED** that any written objections to this Report and

6 Recommendation must be filed with the Court and served on all parties no later than **February**

7 **26, 2016**. The document should be captioned "Objections to Report and Recommendation."

8   **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court

9 and served on all parties no later than **March 11, 2016**.  The parties are advised that failure

10 to file objections within the specified time may waive the right to raise those objections on

11 appeal of the Court's order.  Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v.

12 Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991).

13   **IT IS SO ORDERED**.

14   Dated:  2/11/2016

15   Hon. Barbara L. Major
  United States Magistrate Judge

16

17

18

19

20

21

22

23